UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT GREENEVILLE

UNITED STATES OF AMERICA

    v.

ANDREW ASSAD,  
PETER BOLOS,  
MICHAEL PALSO,  
SYNERGY PHARMACY SERVICES INC.,  
PRECISION PHARMACY MANAGEMENT LLC,  
LARRY EVERETT SMITH,  
ALPHA-OMEGA PHARMACY LLC,  
GERMAINE PHARMACY INC.,  
ERX CONSULTANTS LLC  
   dba ZOETIC PHARMACY,  
TANITH ENTERPRISES LLC  
   dba MEDVEST MANAGEMENT SERVICES,  
     and  
ULD WHOLESALE GROUP LLC

No. 2:18-CR-140

District Judge Greer  
Magistrate Judge Corker

## JOINT MOTION TO DISMISS

Pursuant to Rule 12(b)(3)(B)(v) of the Federal Rules of Criminal Procedure Defendants Larry Everett Smith ("Smith"), Tanith Enterprises, LLC dba Medvest Management Services ("Tanith"), and ULD Wholesale Group, LLC ("ULD") (collectively, the "Defendants") file this Joint Motion to Dismiss. In support, Defendants state the following.

### PRELIMINARY STATEMENT

On October 9, 2018, in a lengthy Indictment, the Government charged Defendants with a scheme to defraud health care benefit programs. Doc. No. 1 (Indictment). More specifically, the Government charged: (1) the Defendants along with Alpha-Omega Pharmacy, LLC ("Alpha-Omega"), Germaine Pharmacy, Inc. ("Germaine"), ERX Consultants LLC dba Zoetic Pharmacy ("Zoetic"), Andrew Assad ("Assad"), Peter Bolos ("Bolos"), Michael Palso ("Palso"), Synergy

Pharmacy Services, Inc. ("Synergy") and Precision Pharmacy Management LLC ("Precision") with conspiracy to commit health care fraud; (2) Smith and Alpha-Omega with mail fraud; and (3) Smith and Alpha-Omega with introduction of misbranded drugs into interstate commerce with the intent to defraud and mislead. Much of the Indictment centers around the alleged activities of government cooperator, Scott Roix ("Roix") and his telemedicine company, HealthRight LLC ("HealthRight").

The Government asserts facts that, if taken as true, simply amount to alleged breaches of contract, not criminal conduct, on behalf of Smith, Tanith, and ULD. The Government claims that Alpha-Omega, Germaine, and Zoetic entered into "contractual arrangements called 'provider agreements,' which incorporate by reference 'provider manuals' and other documents that specify the respective obligations of the PBMs and pharmacies." Doc. No. 1 at ¶ 28.

The Government alleges breaches of some of the numerous provisions set forth in the provider manuals or the provider agreements. *See, e.g., id.* at ¶¶ 67, 74. In essence, the Government has attempted to turn an alleged contractual dispute into a criminal case. For example, the Government claims that Smith caused a breach of these agreements because the pharmacies purportedly failed to collect co-payments from patients for prescriptions generated through HealthRight's marketing services. *Id*. at 74, 78. As detailed below, however, the co-pay assistance program implemented by the Defendants was legal and did not even amount to a possible breach of the PBM agreements. The Government also alleges a potential breach of contract to the extent that the Government claims that Smith concealed his purported ownership of Alpha-Omega, Germaine, and Zoetic when the provider agreements required that the PBMs be notified of a change in ownership or control. *Id*. at ¶ 67. A breach of contract, however, is not a crime. While every crime may be a breach, every breach of a contract is not a crime. The Government's attempt

to criminalize business relationships between the pharmacies and PBMs should not be countenanced. Indeed, the PBMs have their own remedies for alleged breaches, which they exercise routinely. Accordingly, the Court should dismiss the Indictment in its entirety.

Further, the Government has laced the Indictment with allegations regarding State of Florida Statutes. Respectfully, this Court has no jurisdiction over alleged criminal acts under Florida law. Nevertheless, the Government disregards its jurisdictional limitations and improperly requests that violations of Florida state law should be the barometer to adjudicate a breach of a PBM contract, which in turn the Government says is criminal. The Court should not sanction such an improper attempt to expand federal jurisdiction and should dismiss the Indictment.

The Government also turns the practitioner-patient relationship on its head by alleging, without any factual basis, that Smith interfered with the creation of a valid practitioner-patient relationship. *Id*. at ¶ 58. The Indictment is completely devoid of any facts demonstrating that Smith, a wholesaler, is somehow solely responsible for the creation of a valid practitioner-patient relationship instead of the doctor prescribing the medication. Because the Government has failed to allege facts demonstrating Smith committed a criminal offense related to Smith's purported interference with a valid practitioner-patient relationship, the Court should dismiss these allegations against Smith.

The Indictment labels medications sold to Alpha-Omega, Germaine, and Zoetic as "Inflated AWP Medications" because Smith through ULD allegedly purchased the medications "at prices substantially below the manufacturer-reported average wholesale prices ("AWP"), knowing that the [pharmacy benefit managers] PBMs relied on such manufacturer-reported AWPs in calculating how much to pay pharmacies (each an "Inflated AWP Medication")." *Id*. at ¶ 39. The Government further claims that "[t]he purpose and effect of this was that PBMs frequently

3

Case 2:18-cr-00140-JRG-CRW   Document 126   Filed 05/01/19   Page 3 of 18   PageID #: 1262

paid SYNERGY, the PRECISION pharmacies, ALPHA-OMEGA, GERMAINE, AND ZOETIC amounts equal to or slightly less than the manufacturer-reported AWPs of the Inflated AWP Medications, even though the pharmacies: (a) purchased the Inflated AWP Medications at a small fraction of the publicly-reported AWPs; and (b) never or almost never sold the Inflated AWP Medications at the usual and customary prices they represented to the PBMs, and instead sold slightly altered formulations of the Inflated AWP Medications for a small fraction of the amounts billed for the Inflated AWP Medications, contrary to one or more provider agreements." *Id.* at ¶ 42. The Government fundamentally misunderstands AWPs as there was no way for Smith, ULD, or Tanith to "inflate" the AWP. As detailed below, there was nothing criminal about Smith and ULD trying to earn a profit. Accordingly, the Court should dismiss all allegations related to "Inflated AWP Medications" for failure to state a criminal offense.

The Indictment also digresses into uncharged bad acts, alleging several times that Smith, Tanith, and ULD "laundered money." *See id.* at ¶¶ 9, 77, 89. However, the Government indisputably did not bring a money laundering charge against the Defendants, and the Indictment fails to set forth the elements of money laundering under either 18 U.S.C. §1956 or 18 U.S.C §1957. Indeed, it is not even clear under what statutory basis the Government alleges that the Defendants "laundered" money. Consequently, the Court should dismiss all allegations related to money laundering for failure to state an offense.

## MEMORANDUM OF LAW

### I. LEGAL STANDARD

A defendant may move before trial to dismiss an indictment or any count of it that "fail[s] to state an offense…." Fed. R. Crim. P. 12(b)(3)(B)(v). "[A]n indictment is sufficient if it, first contains the elements of the offense charged and fairly informs a defendant of the charge against

which he must defend, and, second enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense." *United States v. Anderson*, 605 F.3d 404, 411 (6th Cir. 2010) (alteration in original) (internal quotation marks omitted) (quoting *Hamling v. United States*, 418 U.S. 87, 117, 94 S.Ct. 2887, 41 L.Ed.2d 590 (1974)).

A motion under Rule 12 is appropriate when it raises questions of law rather than fact. *See United States v. Levin*, 973 F.2d 463, 469 (6th Cir. 1992) (affirming the district court's dismissal of an indictment when "undisputed extrinsic evidence" demonstrated that "the government was, as a matter of law, incapable of proving" an element of the offense). However, it is axiomatic that, "[t]o be legally sufficient, the indictment must assert facts which in law constitute an offense; and which, if proved, would establish prima facie the defendant's commission of that crime." *United States v. Superior Growers Supply, Inc.*, 982 F.2d 173, 177 (6th Cir. 1992) (citing *Fleisher v. United States*, 302 U.S. 218, 58 S.Ct. 148, 82 L.Ed. 208 (1937)) (per curiam)   In *Levin,* the Sixth Circuit explained that:

> Rule 12 of the Federal Rules of Criminal Procedure and its component parts encourage district courts to entertain and dispose of pretrial criminal motions before trial if they are capable of determination without trial of the general issues.  Moreover, district courts may make preliminary findings of fact necessary to decide questions of law presented by pretrial motions so long as the trial court's conclusions do not invade the province of the ultimate finder of fact.

*Id*. at 467.  Thus, a court may look beyond "the face of the indictment so long as the court does not decide disputed factual questions that lie within the province of the jury." *United States v. McDaniel*, Case No. 1:05-CR-171, 2006 WL 839095, at *3 (W.D. Mich. Mar. 28, 2006). When assessing the sufficiency of the charge, the examination focuses on the indictment itself, and not on the underlying evidence of the crime.  *See United States v. Landham*, 251 F.3d 1072, 1080 (6th

Cir. 2001) (citing *Costello v. United States*, 350 U.S. 359, 362–63, 76 S.Ct. 406, 100 L.Ed. 397 (1956)).

## II. THE COURT SHOULD DISMISS THE INDICTMENT BECAUSE A MERE BREACH OF CONTRACT IS NOT CRIMINAL.

"The elements of health care fraud conspiracy under 18 U.S.C. § 1349 are (1) an agreement between two or more persons to (2) 'knowingly and willfully execute[], or attempt[] to execute, a scheme or artifice…to defraud any health care benefit program; or…to obtain, by means of false or fraudulent pretenses, representations, or promises, any of the money or property owned by, or under the custody or control of, any health care benefit program, in connection with the delivery of or payment for health care benefits, items, or services.'" *United States v. Pamatmat*, 756 Fed.Appx. 537, 542 (6th Cir. 2018) (quoting *United States v. Patel*, 579 F.App'x 449, 460 (6th Cir. 2014), *cert. denied*, 2019 WL 936741 (April 1, 2019)). "Conspiracy to commit health-care fraud requires some fraudulent act." *United States v. Patel*, 694 Fed.Appx. 991, 994 (6th Cir. 2017).

"There are two elements in mail fraud: (1) having devised or intending to devise a scheme to defraud (or to perform specific fraudulent acts), and (2) use of the mail for the purpose of executing, or attempt to execute, the scheme (or specified fraudulent acts)." *Schmuck v. United States*, 489 U.S. 705, 721 (1989); *see also Pereira v. United States*, 347 U.S. 1, 8 (1954) ("The elements of the offense of mail fraud under…§ 1341 are (1) scheme to defraud, and (2) the mailing of a letter, etc., for the purpose of executing the scheme."). "A defendant does not commit mail fraud unless he possesses the specific intent to deceive or defraud." *United States v. Frost*, 125 F.3d 346, 254 (6th Cir. 1997) (citing *United States v. Smith*, 39 F.3d 119, 121-22 (6th Cir. 1994)). Materiality of falsehood is a requisite element of mail fraud. *See Neder v. United States*, 527 U.S. 1, 25 (1999). Additionally, under the introduction of misbranded drugs into interstate commerce

6

with the intent to defraud and mislead under 21 U.S.C. § §333(a)(2), the Government must allege an intent to mislead or defraud. *See United States v. Mitcheltree*, 940 F.2d 1329, 1347 (10th Cir. 1991).

The Indictment is fatally flawed because it fails to allege facts that state a criminal offense. Here, at best, the Government alleges that the Defendants caused individual breaches of contract with PBMs because Alpha-Omega, Germaine, and Zoetic purportedly failed to comply with certain contractual terms set forth in the provider agreements or the provider manuals. In the Indictment, the Government claims that "PBMs and pharmacies enter into contractual arrangements called 'provider agreements,' which incorporate by reference 'provider manuals.'"[1] Doc. No. 1 at ¶ 28.

> These provider agreements contain *numerous* provisions, including, without limitation, provisions regarding the manner and means by which pharmacies are required to submit claims for payment to the PBMs, the method by which the PBMs calculate reimbursement amounts, the obligation of the pharmacies to collect patient copays, the obligation of the pharmacies to update ownership and control information, and the obligation of the pharmacies to comply with applicable federal and state laws and regulations.

*Id*. at ¶ 29 (emphasis added). To the extent that the Government claims that Alpha-Omega, Germaine, or Zoetic did not comply with certain individual provisions in the provider agreements, the Government has simply alleged facts constituting individual breaches of contract. When a PBM has a disagreement with a pharmacy or believes that a pharmacy has breached a term in a provider agreement or a provider manual, the PBM has its own remedies, including, but not limited to, arbitration[2], auditing a pharmacy, and/or terminating its contract. Indeed, that is exactly what the Government alleges happened to Alpha-Omega. *See* Doc. No. 1 at ¶ 68.

---

[1] Many of the PBM Provider Manuals are hundreds of pages long.
[2] The PBM Agreements contain arbitration provisions.

It is well established that a breach of contract, or the failure to fulfill a civil obligation, is not a crime. *See, e.g., United States v. D'Amato*, 39 F.3d 1249, 1261 n.8 (2d Cir. 1994). Indeed, "[t]o infer fraudulent intent from mere nonperformance… "would eviscerate the distinction between a breach of contract and fraud." *Id*.; *see also McEvoy Travel Bureau, Inc. v. Heritage Travel, Inc.*, 904 F.2d 786, 791 (1st Cir. 1990) (a breach of contract in itself does not constitute a scheme to defraud). Rather, failure to comply with a contractual obligation is only fraudulent when the promisor never intended to honor the contract. *See D'Amato*, 39 F.3d at 1261 n. 8. Here, the Government does not allege that the Defendants never intended to have the pharmacies honor a PBM provider agreement or a PBM manual. Thus, taking the Government's allegations as true, the Government may have alleged civil breaches of contract, but the Government has failed to allege criminal conduct on behalf of the Defendants.

### A. The Government Failed to Allege a Criminal Offense Related to Defendants' Purported Co-Pay Scheme.

For example, the Government alleges that Smith and ULD "routinely and systematically" failed to collect copayments from patients. Doc. No. 1 at ¶ 89. The Government contends that this is contrary to "one or more of the PBM provider agreements [which] required the pharmacies to collect copays." *Id*. at ¶ 30(c) (citing Sections 2.3 and 2.4a of the Express Scripts Provider Agreement). While the Government may have attempted to allege breaches of provisions in PBM provider agreements or manuals, it has not alleged a crime.

Importantly, the patients' co-pay was not waived, but rather was paid by AlphaScrip, through a co-pay card assistance program. A copy of ULD's co-pay card assistance program coupons and a copy of a check from AlphaScrip remitting payment to Alpha-Omega are attached as **Exhibits 1 and 2** to the Affidavit of T. Magazino, attached as **Exhibit A**. There is no federal statute making it a crime for Smith or ULD to implement a co-pay card assistance program

8

connected to private health care benefit programs.[3] Moreover, the PBMs expressly allow for co-pay card assistance programs. For example, the Express Scripts' PBM Agreement, which is cited by the Government in the Indictment, states:

> <u>Coupons.</u> Provider acknowledges that it is the Member's or Provider's responsibility to obtain reimbursement from the responsible party for the amount of any coupon accepted by Provider for a Covered Medication. Provider shall: (a) accurately apply all coupons to a Member's claim, including the Copayment, if applicable; and (b) not seek additional reimbursement from Sponsor or any other insurer when such reimbursement would result in Provider being paid more than its contracted rate hereunder.

*See* Express Scripts, Inc. Provider Agreement with Alpha-Omega Pharmacy at Section 2.5. Thus, the co-pay card assistance program implemented by the Defendants is perfectly legal. In fact, the Government has not even properly alleged that Defendants civilly breached the PBM Agreement by implementing a co-pay card assistance program through AlphaScrip.

Indeed, Alpha-Omega was audited by CVS Caremark and had to provide documentation demonstrating that the co-payment for 655 prescriptions was properly reimbursed by AlphaScrip. *See* Affidavit of T. Magazino at ¶¶ 7, 10. Alpha-Omega provided the requested information, but was unable to demonstrate that 14 of the prescriptions' copayments were properly reimbursed due to an accounting error. *Id.* at ¶ 11. CVS Caremark simply required that Alpha-Omega pay the outstanding amount due.[4] *Id*. Alpha-Omega then sought payment from AlphaScrip under the co-pay card assistance program for the outstanding 14 prescriptions, and appealed Caremark's decision to deny payment on those 14 prescriptions. *Id*. at ¶ 12. CVS Caremark denied Alpha-

---

[3] Alpha-Omega, Germaine, and Zoetic did not dispense prescriptions from HealthRight for patients with insurance provided by federal health care programs such as Medicaid, Medicare, or TRICARE. *See* Affidavit of T. Magazino at ¶ 5.

[4] The section of the CVS Caremark Provider Manual on Coupons and Other Programs states that "[c]laims submitted in violation of this section are subject to chargeback." Caremark Provider Manual, p. 15, attached hereto as **Exhibit B**.

Omega's appeal, and Alpha-Omega made the additional payments to Caremark. *Id*. at ¶ 13. Accordingly, the co-pay card assistance program implemented by Defendants is legal and does not even constitute a civil breach of contract.

    **B.    The Government Failed to Allege a Criminal Offense Related to Smith's Alleged Concealment of His Purported Ownership or Control of Pharmacies.**

The Government also claims that "[d]uring the time period of this indictment, the PBM provider agreements required the pharmacies to notify the PBMs of changes in ownership." Doc. No. 1 at ¶ 30(a). The Government further alleges that Smith "subverted these requirements by concealing [his] ownership of, or economic or controlling interests in, various pharmacies." *Id*. at ¶ 67. Here again, the Government may have alleged a civil breach of contract, but it has not alleged facts sufficient to state a criminal offense.

    **C.    The Government Failed to Allege a Criminal Offense Related to the Defendants' Purported Failure to Comply With "All Applicable, Laws, Rules, and Regulations" As Set Forth in PBM Agreements.**

The Government also points to boilerplate provisions in some PBM provider agreements which require pharmacies to comply with "all applicable, laws, rules, and regulations…." *Id*. at ¶ 30(d). Again, to the extent that the Government claims that the Defendants failed to comply with applicable laws, rules, and regulations, the Government is, at best, alleging a breach of the PBM agreements. The Government then cites to several Florida Statutes over which this Court has no jurisdiction. *Id*. at ¶ 30(i). Nevertheless, the Government disregards its jurisdictional limitations and asks this Court to improperly adjudicate violations of Florida State law under the guise of a breach of the PBM agreements, which the Government contends is criminal. *See, e.g., id.* at ¶ 38. To the extent that the Government claims that the Defendants caused the pharmacies to fail to

comply with provisions in the PBM agreements by violating certain Florida Statutes, this Court has no jurisdiction to consider purported violations of Florida law.

Even if the Government's attempt to elevate this Court's jurisdiction to hear disputes regarding Florida Statutes was proper—which it is not—the Government's allegation that the Defendants somehow violated Florida's Anti-Kickback Statute, Fl. Stat. § 456.054(2), is incorrect. Section 456.054(1) of the Florida Statutes, which was not cited by the Government in the Indictment, defines kickbacks to mean:

> [A] remuneration or payment, by or on behalf of a provider of health care services or items, to any person as an incentive or inducement to refer patients for past or future services or items, when the payment is not tax deductible as an ordinary and necessary expense.

Thus, under Florida law payments—such as the marketing expenses paid to HealthRight—that are tax deductible as an ordinary and necessary expense are not kickbacks. Therefore, the marketing expense payments from Alpha-Omega, Zoetic, and Germaine to HealthRight were perfectly legal under Florida law. Again, the Government has failed to allege any criminal conduct on behalf of the Defendants. Accordingly, the Indictment should be dismissed as the Government has failed to allege facts amounting to a criminal offense committed by the Defendants.

### III. THE COURT SHOULD DISMISS ALL ALLEGATIONS AGAINST SMITH RELATED TO THE ABSENCE OF A VALID PRACTITIONER-PATIENT RELATIONSHIP FOR FAILURE TO STATE A CRIMINAL OFFENSE.

The Government claims that "Roix and HealthRight, with the knowledge of…LARRY SMITH, interfered with the creation of a valid practitioner-patient relationship by submitting all or substantially all patient consults in electronic or 'e-consult' format as opposed to telephonic format." Doc. No. 1 at ¶ 58. The Government alleges that Assad, Bolos, and Palso designed a "phony" doctor attestation, but provides no factual information on how Smith purportedly interfered with the practitioner-patient relationship. *See id*. at ¶¶ 58-66. Rather, the Government

has foisted the responsibility of a practitioner-patient relationship on its head and away from the doctors. The Government provides no basis whatsoever for Smith, a wholesaler, to be solely responsible for a practitioner-patient relationship instead of the doctor who was prescribing the medication. Indeed, the doctor had access to recordings of phone calls with patients and could have contacted the patient directly at any time. As such, the Government has failed as a matter of law to allege any facts amounting to criminal conduct on behalf of Smith to interfere with a valid practitioner-patient relationship, and the Court should dismiss these allegations for failure to state an offense.

IV. **THE COURT SHOULD DISMISS ALL ALLEGATIONS AGAINST DEFENDANTS RELATED TO "INFLATED AWP" FOR FAILURE TO STATE AN OFFENSE.**

The Indictment alleges no facts, even if proven true, which establish a criminal act related to the Defendants conspiring to defraud any health care program by "inflating" the AWP. In the Government's own words, a pharmaceutical manufacturer's average wholesale price ("AWP") is a figure "reported by the manufacturer of that medication to data repository companies like Medi-Span and Redbook." Doc. No. 1 at ¶ 40; *see also United States v. CSL Behring, L.L.C.*, 855 F.3d 935, 938 (8th Cir. 2017) ('[T]he AWP is based on figures that the drug manufacturer reports to third-party publishers, such as Red Book."). According to Wolters Kluwer U.S. Drug Price Data Policy:

> AWP is not based on actual transactional, marketplace price data. Despite its name and its possible use as a price index, the AWP published by WKCDI is not an average of actual wholesale prices. It is not derived from, does not reflect, and should not be assumed to represent, either (i) the actual prices paid for drug products in transactions between wholesalers (meant to include any party that buys drug products directly from a manufacturer) and their customers, or (ii) any discounts, rebates or other price reductions (e.g. purchase or prompt-pay discounts, volume rebates or credits, etc.) that wholesalers may offer to their customers in connection with those transactions. A wholesaler or other direct purchaser from a pharmaceutical

> manufacturer may agree to sell its products to one or more of its customers at a price that is on its face or effectively different than the AWP published by WKCDI. WKCDI relies entirely on information reported to it by drug manufacturers (including distributors, labelers, or repackagers that set relevant pricing) in determining the AWP that it publishes for a particular drug.

See Wolters Kluwer, U.S. Drug Price Data Policy, 2016 Revision, attached as **Exhibit C**. Nevertheless, the Government refers to "Inflated" AWPs *88 times* in the Indictment.

As the Defendants previously asserted—without any dispute from the Government—there was no way for them to "inflate" the AWP. See Doc. No. 104 at 8. The Defendants had nothing to do with setting the AWP for any medication. Indeed, the phrase "Inflated AWP" or "Inflated AWP Medication," as defined in the Indictment, does not actually refer to any literal inflation by Smith, Tanith, or ULD of the AWP figures reported by drug manufacturers. Instead, it refers to medications which were *purchased by ULD, a wholesaler, from a manufacturer at a discount from the AWP and then sold to Alpha-Omega, Germaine, or Zoetic for a higher price than the amount that ULD purchased the medication*,[5] prescribed to a patient, and then billed to the relevant insurance program through the PBMs, which "relied on . . . AWPs in calculating how much to pay pharmacies." Doc. 1 at ¶39. When Alpha-Omega, Germaine, or Zoetic submitted a prescription to a PBM for payment, the PBM *required* that the pharmacy report the manufacturer-set AWP for that medication. In fact, the AWP is auto-populated into the information provided by the pharmacy to the PBM. The PBM generally did not pay the pharmacy the AWP. Instead, the PBM paid the pharmacy an amount lower than the AWP, so that the PBM could also earn a profit. Purchasing

---

[5] In Paragraph 39 of the Indictment, the Government includes a chart showing Alpha-Omega's purported purchase price for a specific drug. However, the Government's chart is incorrect. The chart lists the price for which ULD, not Alpha-Omega, purchased the drug. ULD subsequently sold the drug to Alpha-Omega for a substantially higher purchase price than what is listed on the chart.

medicine at a price lower than the AWP and profiting as a result is (a) not illegal,[6] and (b) does not actually constitute an "inflation" of the AWP figure itself. Indeed, this is common practice in the pharmaceutical industry.

Moreover, the Government alleges that "Smith routinely caused Alpha-Omega, Germaine, and Zoetic, to submit claims for payments to the PBMs in which they represented that their usual and customary price for Inflated AWP Medications was equal to the manufacturer-reported AWP of such Inflated AWP Medications. However, they actually purchased those Inflated AWP Medications at a small fraction of their reported AWPs…." Doc. No. 1 at ¶ 39. The Government fundamentally misunderstands the usual and customary price. The usual and customary price of a medication—as defined by the Government in the Indictment—is generally the cash price, or "the price an individual without prescription drug coverage would pay at a retail pharmacy." *Id*. at ¶ 40; Prescription Drugs: Trends in usual and customary prices for commonly used drugs. GAO Reports. March 14, 2011, p. 1 n. 2 available at https://www.gao.gov/assets/100/97284.pdf (last visited April 30, 2019). It is not the amount the pharmacy purchased the medication, as implied by the Government in paragraph 39 of the Indictment.

Consequently, any allegations related to a scheme to "inflate" the AWP or misrepresent the usual and customary price of a medication should be dismissed for failure to state a criminal offense.

---

[6] At the hearing on the Motion to Strike Surplusage from the Indictment, the Government acknowledged that "there's nothing inherently illegal about trying to make a profit." Doc. No. 125 (April 3, 2019 Hearing Tr. at p. 87).

## V. THE COURT SHOULD DISMISS ALL ALLEGATIONS RELATED TO MONEY LAUNDERING FOR FAILURE TO STATE AN OFFENSE.

The Indictment digresses into uncharged bad acts, alleging several times that Smith, Tanith, and ULD "laundered money." Doc. No. 1 at ¶¶ 9, 77, 89. For example, in paragraph 9, without any further description, the Government alleges that "LARRY SMITH used ULD…to purchase Inflated AWP Medications…for, and launder money on behalf of, ALPHA-OMEGA, GERMAINE, and ZOETIC, in each case in furtherance of the conspiracy as described herein." *Id*. at ¶ 9. In Paragraph 77, the Government alleges that "SMITH, TANITH, and ULD WHOLESALE employed at least one scheme to launder money through a company called AlphaScrip Inc. to make it appear to the PBMs as though ALPHA-OMEGA, GERMAINE, and ZOETIC were collecting copays when, in fact, they routinely and systematically failed to do so." *Id*. at ¶ 77. Finally, the Government alleges that "[f]rom on or about March 6, 2017 through on or about January 19, 2018, LARRY SMITH and ULD…laundered not less than $1,184,401 through AlphaScrip Inc. for the purpose of deceiving PBMs by making it appear as though ALPHA-OMEGA, GERMAINE, and ZOETIC were collecting copays when in fact they routinely and systematically failed to do so." *Id*. at ¶ 89. These are the only allegations related to money laundering, and the Indictment indisputably does not contain a charge for money laundering against any of the Defendants.

The crime of money laundering is set forth in 18 U.S.C. §§ 1956-1957 and Title 31. Unfortunately, the Government does not even address which money laundering statute is involved. One is left to simply guess whether provisions of Title 18 or Title 31 apply.

Section 1956(a) defines three types of criminal conduct: domestic money laundering transactions (§1956(a)(1)); international money laundering transactions ((§1956(a)(2)); and undercover "sting" money laundering transactions (§1956(a)(3)). To state a cause of action for money laundering under Section 1956(a)(1), the Government must allege that the Defendants

conducted or attempted to conduct a financial transaction, knowing that the property involved in the financial transaction represents the proceeds of some unlawful activity[7], with one of four specific intents, and the property must in fact be derived from a specified unlawful activity. *See United States v. Moss*, 9 F.3d 543, 550, 551 (6th Cir. 1993). In conducting the financial transaction, the Defendants must have acted with one of the following four specific intents: (1) § 1956(a)(1)(A)(i) intent to promote the carrying on of specified unlawful activity; (2) § 1956(a)(1)(A)(ii) intent to engage in tax evasion or tax fraud; (3) § 1956(a)(1)(B)(i) knowledge that the transaction was designed to conceal or disguise the nature, location, source, ownership or control of proceeds of the specified unlawful activity; or (4) § 1956(a)(1)(B)(ii) knowledge that the transaction was designed to avoid a transaction reporting requirement under state or federal law (e.g. in violation of 31 U.S.C. §§ 5313 (Currency Transaction Reports) or 5316 (Currency and Monetary Instruments Reports), or 26 U.S.C. § 6050I (Internal Revenue Service Form 8300). *See* https://www.justice.gov/jm/criminal-resource-manual-2101-money-laundering-overview (last visited April 25, 2019).

Title 18 U.S.C. § 1957(a) makes it a crime for parties to "knowingly engage[] or attempt[] to engage in a monetary transaction in criminally derived property of a value greater than $10,000 [which] is derived from specified unlawful activity." 18 U.S.C. § 1957(a). The Government must allege that Defendants: (1) engaged in a financial transaction involving the proceeds of unlawful activity; (2) knew the proceeds derived from unlawful activity; and (3) the proceeds exceeded $10,000 in value. *United States v. White*, 492 F.3d 380, 397 (6th Cir. 2007). "Under § 1957, the four intents have been replaced with a $10,000 threshold amount for each non-aggregated

---

[7] The actual source of the funds must be one of the specified forms of criminal activity identified by the statute, in 18 U.S.C. § 1956(c)(7), or those incorporated by reference from the RICO statute (18 U.S.C. § 1961(1)).

transaction and the requirement that a financial institution be involved in the transaction. Although the [Government] need not prove any intent to promote, conceal or avoid the reporting requirements, it still must be shown that the defendant knew the property was derived from some criminal activity and that the funds were in fact derived from a specified activity." *See* https://www.justice.gov/jm/criminal-resource-manual-2101-money-laundering-overview (last visited April 25, 2019).

Quite simply, the Indictment does not charge Smith, ULD, or Tanith with money laundering, nor does it even attempt to set forth the elements of money laundering. It is not even clear from the Indictment whether the Government is alleging that Smith, ULD, and Tanith violated 18 U.S.C. § 1956, 18 U.S.C. § 1957, or a Title 31. It is undisputed that the money laundering allegations in the Indictment do not inform Smith, ULD, and Tanith of the charges against which they must defend. These Defendants cannot be left to guess what type of "money laundering" the Government is attempting to allege. As detailed above, money laundering engulfs many types of crimes and is a fully loaded term to use in front a jury. Consequently, the Indictment fails to state an offense of money laundering as a matter of law, and the Court should dismiss all allegations regarding "money laundering" against Smith, ULD, and Tanith.

## CONCLUSION

Based on the foregoing, the Joint Motion to Dismiss should be granted in all respects.

Dated: May 1, 2019               Respectfully submitted,

/s/ *Gregory W. Kehoe*
Gregory W. Kehoe (FBN 0486140)
kehoeg@gtlaw.com
Danielle S. Kemp (FBN 0474355)
kempd@gtlaw.com
**GREENBERG TRAURIG, P.A.**
101 E. Kennedy Blvd., Suite 1900

17
Case 2:18-cr-00140-JRG-CRW   Document 126   Filed 05/01/19   Page 17 of 18   PageID #: 1276

Tampa, FL 33602
(813) 318-5700
(813) 318-5900 (facsimile)

*Attorneys for Smith, Tanith and ULD*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on May 1, 2019, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to all parties indicated on the electronic filing receipt.

/s/ *Gregory W. Kehoe*
Attorney